# Commonwealth of Massachusetts

SUFFOLK, ss.



SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION

No. 1684CV01189 (A)

Erin Shue and Maria Currie , Plaintiff(s)

v.

Trustees of Boston University and , Defendant(s)
Eric Ruske

## SUMMONS

NOTICE TO DEFENDANT — You need not appear personally in court to answer the complaint, but if you claim to have a defense, either you or your attorney must serve a copy of your written answer within 20 days as specified herein and also file the original in the Clerk's Office.

To the above-named Defendant: Trustees of Boston University

You are hereby summoned and required to serve upon Carmen L. Durso and Sara Elizabeth Burns plaintiff's attorney, whose address is 175 Federal Street, Suite 1425, Boston, MA 02110-2287, an answer to the complaint which is herewith served upon you, within 20 days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the complaint. You are also required to file your answer to the complaint in the office of the Clerk of this court at Boston either before service upon plaintiff's attorney or within a reasonable time thereafter.

Unless otherwise provided by Rule 13(a), your answer must state as a counterclaim any claim which you may have against the plaintiff which arises out of the transaction or occurrence that is the subject matter of the plaintiff's claim or you will thereafter be barred from making such claim in any other action.

Witness, ~~Barbara J. Rouse~~ **Judith Fabricant**, Esquire, at Boston, the 25th day of May, in the year of our Lord two thousand Sixteen .

*Michael Joseph Donovan*

Clerk/Magistrate

NOTES.
1. This summons is issued pursuant to Rule 4 of the Massachusetts Rules of Civil Procedure.
2. When more than one defendant is involved, the names of all defendants should appear in the caption. If a separate summons is used for each defendant, each should be addressed to the particular defendant.
3. TO PLAINTIFF'S ATTORNEY: PLEASE CIRCLE TYPE OF ACTION INVOLVED
   (1) TORT — (2) MOTOR VEHICLE TORT — (3) CONTRACT — (4) EQUITABLE RELIEF — (5) OTHER

FORM CIV.P. 1 3rd Rev. 20M-10/11

## PROOF OF SERVICE OF PROCESS

I hereby certify and return that on ______________, 201___, I served a copy of the within summons, together with a copy of the complaint in this action, upon the within-named defendant, in the following manner (See Mass. R. Civ. P. 4 (d) (1-5):

______________________________________________

______________________________________________

______________________________________________

Dated: ________________, 201_____.    ______________________________

**N.B. TO PROCESS SERVER: –**
**PLEASE PLACE DATE YOU MAKE SERVICE ON DEFENDANT IN THIS BOX ON THE ORIGINAL AND ON COPY SERVED ON DEFENDANT.**

| , 201 . |
|---|

## Commonwealth of Massachusetts

SUFFOLK, ss.

SUPERIOR COURT DEPARTMENT
OF THE TRIAL COURT
CIVIL ACTION
No. 1684 CV 01189 (A)

Erin Shyr and Maria Currie, Plff(s).

v.

Trustees of Boston University and Eric Ruske, Deft(s).

SUMMONS
(Mass. R. Civ. P. 4)

(AFFIX FILING STAMP HERE)

COMMONWEALTH OF MASSACHUSETTS

SUFFOLK, SS.

SUPERIOR COURT DEPARTMENT
CIVIL ACTION NO. 16-1189A

ERIN SHYR and )
MARIA CURRIE, )
    Plaintiffs )
                )
                )
v. )
                )
TRUSTEES OF BOSTON )
UNIVERSITY and ERIC RUSKE, )
    Defendants )

**COMPLAINT**

**JURY TRIAL DEMANDED**

### INTRODUCTION

1.    This action against TRUSTEES OF BOSTON UNIVERSITY and ERIC RUSKE arises out of the sexual harassment of MARIA CURRIE and ERIN SHYR, young, female students of ERIC RUSKE at BOSTON UNIVERSITY. Claims against TRUSTEES OF BOSTON UNIVERSITY—brought by both plaintiffs—are for negligent hiring, training, supervision, and retention and failing to fulfill their obligations under Title IX, 20 U.S.C. § 1681. Claims against ERIC RUSKE— brought by both plaintiffs—are for negligent and intentional infliction of emotional distress, and—brought by ERIN SHYR—claims for assault and battery.

### PARTIES

2.    Plaintiff ERIN SHYR ("ERIN") has a usual place of residence at Boston, Suffolk County, Massachusetts.

3.    Plaintiff MARIA CURRIE ("MARIA") has a usual place of residence at Boston, Suffolk County, Massachusetts.

1

4. Defendant TRUSTEES OF BOSTON UNIVERSITY ("BU" or the "UNIVERSITY") is an educational institution incorporated by Chapter 322 of the Acts of 1869, with its principal place of business at One Silber Way, Boston, Suffolk County, Massachusetts.

5. Defendant ERIC RUSKE ("RUSKE") has a usual place of residence at 139 Mason Terrace, Brookline, Norfolk County, Massachusetts.

## FACTS COMMON TO ALL COUNTS

6. Since May 1, 2014, BU has been subject to a formal investigation by the Office of Civil Rights, part of the United States Department of Education, related to its compliance with Title IX, 20 U.S.C. § 1681 ("Title IX") when responding to complaints of sexual harassment.

7. Instances of sexual harassment as defined by Title IX have been common at BU for well over a decade.

8. During this time period, when students have reported sexual harassment to BU's officers, administrators, employees, and staff (such agents, unless known by name or position, hereinafter referred to as "BU"), BU has failed to adhere to written policies for responding to harassment.

9. Also, during this time period, written policies have led to a system where BU favors perpetrators of harassment over victims.

10. For instance, BU's policies do not prescribe specific consequences that must or should be imposed on perpetrators.

2

11. BU's sexual harassment policy from approximately September 2009 through December 2014 stated: "After an investigation, any person who is found to have sexually harassed . . . another will be subject to discipline, up to and including termination of employment . . . ."

12. When BU implemented a new policy in January 2015, it outlined procedures for complaints, investigations, and sanctions, but failed to require—or recommend—particular sanctions for sexual harassment.

13. When harassers are BU faculty members who also attract grant money, enjoy national or international reputations of excellence in their field, or hold tenure, BU fails to sanction them appropriately.

14. As a result, BU nurtured an environment where faculty members understand that if they harass one of their students, they will face few, if any, consequences.

15. Such has been the environment in the School of Music at BU's College of Fine Arts ("CFA").

16. Plaintiffs are informed and reasonably believe that:

    i.    In or around 2007 a piano faculty member departed the CFA. Around this time, BU investigated sexual harassment by the instructor, but failed to make any information surrounding his misconduct available, giving him the opportunity to continue working with piano students and avoiding any harm to BU's reputation.

      ii.    In the fall of 2013, a student at the CFA reported a sexual assault by Enrique Marquez ("Marquez"), an employee of the CFA, while on a concert tour.

      iii.    Prior to working for BU, Marquez—a graduate of one of the top music conservatories in the United States—had been principal viola of two internationally touring orchestras.

      iv.    The student did not receive notice of the outcome of her report or any investigation.

      v.    Today, Marquez is the Executive and Artistic Director of the Orquesta Filarmónica de Boca del Río, an organization which offers programing for young musicians.

17.    At all times relevant to this action, CFA directed students to report sexual misconduct to any one of the following individuals: Patricia Mitro ("Mitro"), CFA Deputy Title IX Coordinator; Eleanor Druckman ("Druckman"), Assistant Director of the Office of Equal Opportunity; Kim Randall ("Randall"), BU's Title IX Coordinator; or a member of the administrative staff of their school.

18.    At all times relevant to this action, Sarah Bellott ("Bellott") was the Student Services Coordinator stationed in either the CFA's Office of Admissions and Student Affairs, or Office of the Director.

19.    At all times relevant to this action, the Student Services Coordinator was an administrative position.

20. At all times relevant to this action, the Student Services Coordinator's responsibilities included providing guidance to undergraduate students on both academic and personal issues.

21. RUSKE is a professional horn soloist, with over 30 years of experience performing with major orchestras and chamber groups all over the globe.

22. In approximately 1984—when RUSKE was 20 years old—the Cleveland Orchestra, considered one of the top orchestras in the United States, named RUSKE Associate Principal Horn.

23. In the latter half of the 1980s, RUSKE took the top prize at three international horn competitions.

24. In addition to live performances, RUSKE recorded albums that are widely available for purchase.

25. In 1990, RUSKE took a teaching position at the UNIVERSITY in the School of Music.

26. BU's Tanglewood Institute, a summer program for middle and high school musicians, selected RUSKE as Director of Horn Seminar in 1998.

27. In 2004, BU promoted RUSKE to Associate Professor, a title the UNIVERSITY reserves for professors with "a national reputation as a scholar or professional."

28. RUSKE was inducted into the Illinois Hall of Fame in 2007.

29. BU promoted RUSKE again in 2008 to Professor, a title the UNIVERSITY reserves for those with "a distinguished record of accomplishment that leads to an international . . . reputation in his or her field."

30. RUSKE has received grants from several domestic and foreign grantmakers, including BU, for his work as a musician.

31. The field of classical music is dominated by men, with men holding most of the leadership positions in professional ensembles and male musicians dominating the brass sections of most ensembles.

32. In September 2012, MARIA entered the CFA at BU as a freshman to study trumpet performance.

33. MARIA enrolled in a chamber ensemble (the "quintet") as part of her coursework in September 2013.

34. BU assigned RUSKE to coach the quintet.

35. By this time, RUSKE had developed a reputation for making offensive, vulgar, and sexually charged statements to students, both during group rehearsals as well as during one-on-one encounters.

    i.    Many male students found RUSKE's comments humorous.

    ii.   Most female students found RUSKE's comments offensive.

    iii.  BU knew of these statements and—rather than addressing them as sexual harassment—attributed them to RUSKE's personality.

    iv.   Knowledge of RUSKE's sexual harassment of young musicians extended beyond BU's campus; RUSKE was known in the music industry for sexually harassing young women.

36. MARIA was one of the youngest musicians in the quintet and one of only two women.

37. MARIA was nineteen when she was a student in the quintet.

38. RUSKE was approximately 50 (30 years older than MARIA) when he coached the quintet.

39. The quintet had an early morning rehearsal on November 8, 2013.

40. MARIA arrived to the rehearsal dressed for an afternoon professional meeting.

41. For this meeting, MARIA wore a knee-length pencil skirt and dress shoes with high heels.

42. When RUSKE saw MARIA, he smiled, raised his eyebrows, and exclaimed, "Ooh, heels!" as he looked MARIA up and down.

43. MARIA ignored RUSKE's statement.

44. On December 16, 2013, MARIA played for a panel of three brass faculty members, including RUSKE, as part of the requirements for her coursework.

45. MARIA did not pass this performance requirement.

46. MARIA ran into RUSKE later in the day and requested a meeting to receive feedback on her performance.

47. RUSKE agreed to meet with MARIA, provided his cellular telephone number, and asked her to use this number to communicate with him to arrange their meeting.

48. Later in the day, RUSKE emailed MARIA.

49. RUSKE wrote, "I will certainly miss hearing and working with you in the quintet next semester (and of course seeing the concert heels)."

50. MARIA did not respond to this email.

51. On December 17, 2013, RUSKE met with MARIA in his office.

52. Their meeting lasted approximately 30 minutes.

53. During the meeting, RUSKE stared and used vulgar and obscene language.

54. At one point, RUSKE compared MARIA's December 16, 2013 performance to sex, stating that listening to MARIA play made him feel like the two of them were having sexual intercourse but that MARIA, though very beautiful, was only lying there and not doing anything.

55. Minutes later, MARIA ended the meeting.

56. At the time of this meeting, MARIA had not received a grade for her work in the quintet coached by RUSKE.

57. A few minutes after MARIA left RUSKE's office, he sent MARIA a text message that read, "Fabulous chatting…and great blouse! "

58. MARIA was uncomfortable, but felt obligated to acknowledge RUSKE's message.

59. MARIA responded, by thanking RUSKE and telling him to, "[h]ave a great break!"

60. About two and a half hours later, RUSKE sent MARIA another text message, which read, "Without being too grossly inappropriate. [sic] I hope Santa brings you nice high heels."

61. MARIA felt obligated to respond to RUSKE, so she responded, again thanking him.

62. RUSKE messaged MARIA again, an hour later: "It's such a shame that I won't ever get to see them/you."

63. MARIA wanted to steer the conversation back to music: her field of study and RUSKE's profession.

64. MARIA responded almost immediately, "I'll be having a recital sometime next semester!"

8

65. Fifteen minutes later, RUSKE responded, "And the last thing you need is some creepy old guy in the front row. 😀"

66. RUSKE instantly followed this text—where he labeled himself as a creepy old guy—with another text: "You can always send pix…".

67. Because of the context of this request, MARIA inferred RUSKE was requesting photographs of her without any clothing.

68. It is a common and generally accepted practice when soliciting photographs of young women without any clothing via text message to ask for (a) "pic(s)," "pix," or "picture(s)," without explicitly requesting the photographs be of a sexual nature.

69. Because of RUSKE's status as MARIA's professor and internationally recognized musician, MARIA felt obligated to respond politely even though she felt uncomfortable.

70. MARIA replied with a text message that read, "Ha, no promises[.]"

71. RUSKE acknowledged MARIA's reply with a text message, which read, "Of course not…a girl can dream, though."

72. MARIA decided to ignore RUSKE's message.

73. RUSKE intentionally drafted the December 17, 2013 messages with sexual language and innuendos in the hope of initiating a sexual relationship with MARIA.

74. RUSKE acknowledged these inappropriate comments when he contacted MARIA via a December 24, 2013 text message: "I probably owe you an apology…I'm

really sorry if I made you uncomfortable. Have a fabulous holiday and a happy [N]ew [Y]ear!!"

75. MARIA did not respond to this message.

76. BU's sexual harassment policy at the time of the November and December 2013 sexual harassment stated in relevant part: "Conduct is unwelcome when the person being harassed does not solicit or invite it and regards it as undesirable or offensive. The fact that a person may accept the conduct does not mean that he or she welcomes it."

77. In January 2014, MARIA began spring semester of her sophomore year, not as a BU student, but as a student at a neighboring university.

78. During January 2014, MARIA was at the CFA to practice.

79. There, she saw RUSKE, who attempted to engage in conversation with her.

80. MARIA avoided eye contact and left the area.

81. On January 30, 2014 MARIA met with Bellott at Bellott's office at BU.

82. MARIA showed Bellott the text messages from RUSKE.

83. Bellott appeared uncomfortable and told MARIA she should have asked RUSKE to stop sending the text messages.

84. The response of this administrative staff member surprised and discouraged MARIA, who—prior to this meeting—believed BU cared about the wellbeing of students.

85. In spring 2014, ERIN, an oboist, was a freshman at CFA's School of Music.

86. ERIN's spring semester schedule included a woodwind chamber group that RUSKE coached.

87. RUSKE was approximately 50 (31 years older than ERIN) when he coached the quintet.

88. RUSKE began to sexually harass ERIN during BU's Spring Recess.

89. On Friday, March 7, 2014, RUSKE emailed ERIN to praise her playing in the previous day's rehearsal.

90. ERIN replied, thanking RUSKE.

91. In this email ERIN addressed RUSKE as "Mr. Ruske."

92. RUSKE replied, stating, "I would tell you that you don't have to call me Mr. Ruske, but I don't want to make you uncomfortable."

93. ERIN responded, "Mr. Ruske, it wouldn't make me uncomfortable to call you Eric, but I think it's only right for me to show you respect by calling you Mr. Ruske."

94. RUSKE began his reply, "Absolutely adorable, you are!!!"

95. RUSKE once again praised ERIN, "You may show me respect by practicing your part, showing up for rehearsal prepared, learning about the composers (and the piece), and making a contribution to your group. In short...you already do."

96. On Tuesday, March 11, 2014, RUSKE emailed ERIN stating that he hoped her spring break was going well.

97. ERIN responded, using RUSKE's first name as he requested, "Thank you, Eric! It was a beautiful day today! I hope your spring break is going well too!"

98. RUSKE replied, "Hooooray!!! Maybe you'll share a cute pic with me... ☺ "

99. ERIN worried RUSKE's email was a request for photographs of her without any clothing.

100. It is a common and generally accepted practice when soliciting photographs of young women without any clothing via text message to ask for (a) "pic(s)," "pix," or "picture(s)," without explicitly requesting the photographs be of a sexual nature.

101. Worried about RUSKE's response if she denied his request, ERIN tried to pretend she did not understand it.

102. ERIN's reply email read, "I haven't taken many pictures in NYC, but here is picture of my sister and I after her concert, and the other is a picture of a stray cat that we fed leftovers to!"

103. RUSKE persisted and wrote, "Forgive me for being a bit prejudiced, but although your sister and the kitty . . . are cute, you are amazing and do have something truly unique. Please don't be offended by by [sic] honesty…as I think you already know, I am rather blunt. Thanks for sharing…I like that."

104. Because of RUSKE's position as her professor and internationally recognized musician, ERIN felt obligated to respond, so she wrote, "Thank you sir, that's very kind of you. I hope you have a good evening."

105. RUSKE acknowledged his inappropriate behavior in a reply email: " ᵉ …with the addition of 'sir', I do indeed understand that I overstepped my boundaries. I promise to practice restraint. Have a fabulous evening!"

106. After the March 11, 2014 email chain, RUSKE continued to sexually harass ERIN.

107. In all interactions after March 11, 2014, ERIN referred to RUSKE as "Mr. Ruske" or "Sir," in an attempt to discourage his unprofessional behavior.

108. Around this time, RUSKE began greeting ERIN with kisses on the cheek.

109. Also, RUSKE began hugging ERIN.

110. When RUSKE hugged ERIN, his hand grazed her lower back.

111. On March 17, 2014, RUSKE emailed ERIN "Whooo-hooo!! Great to see you today...happy Monday!!" after he happened to see ERIN on BU's campus.

112. ERIN felt obligated to reply, so she wrote, "Happy Monday to you too, Mr. Ruske! See you at rehearsal."

113. After a rehearsal on March 20, 2014, RUSKE emailed ERIN, "You are so damn bright and also wicked adorable. Tough to be insistent when you're the lowest rung on the ladder (age-wise), but it's great training for you. Smile and be tough at the same time."

114. ERIN replied, "Thank you, sir. I will continue to work hard in chamber class."

115. RUSKE again acknowledged his inappropriate conduct when he replied minutes later, " ...I prefer, "[T]hanks [E]ric, for the inappropriate comments."

116. On March 25, 2014, ERIN sent RUSKE a professional email about scheduling rehearsal.

117. After RUSKE received ERIN's March 25, 2014 email, he sent ERIN an email, which read: "Have to admit that I liked it when you were less formal....and sent pictures. Happy Tuesday!!"

118. RUSKE often praised ERIN in person, and told ERIN she was "special" and "adorable."

119. ERIN feared that, if she confronted RUSKE about his inappropriate behavior, he would retaliate by giving her poor grades or use his notoriety to hurt ERIN's music career.

120. ERIN discussed RUSKE with her mentor ("Mentor"), a professional musician that lives in Georgia.

121. Even though Mentor lived nearly 1,000 miles away from Boston and played a different instrument than RUSKE, Mentor was quickly able to learn about RUSKE's reputation for harassing young, female musicians.

122. Mentor told ERIN to stay as far away from RUSKE as possible.

123. One classmate learned of the harassment and told ERIN that RUSKE harasses students and ERIN should "keep [her] head down and he'll eventually stop."

124. As a result of RUSKE's sexual harassment, contact with RUSKE became a significant source of stress for ERIN.

125. To avoid RUSKE, ERIN hid behind doors and walls at BU whenever she saw him approach.

126. In early April 2014, ERIN reported RUSKE to a trusted faculty member, Robert Roe ("Professor Roe").

127. This faculty member helped ERIN contact Mitro.

128. Erin emailed Mitro on April 8, 2014 to arrange a time to discuss RUSKE's harassment.

129. RUSKE emailed ERIN on April 10, 2014.

130. This email included the following statement: "Sorry for having crossed the line and made [sic] you feel uncomfortable."

131. On April 14, 2014, ERIN met with Mitro and Druckman.

132. At this meeting, ERIN detailed RUSKE's harassment and showed Mitro and Druckman copies of the emails RUSKE sent.

133. ERIN also provided the information she knew about RUSKE's harassment of others.

134. At the time of this meeting, ERIN and MARIA had not met one another.

135. Also at the time of this meeting, neither ERIN nor MARIA had heard of RUSKE's harassment of the other.

136. Mitro and Druckman told ERIN that RUSKE's conduct was sexual harassment, so a staff member would speak to RUSKE.

137. Mitro told ERIN that, because of RUSKE's "vibrant and effusive" personality, he may have been unaware that he violated BU's Title IX policies.

138. BU did not change RUSKE's status as coach of ERIN's ensemble or remove RUSKE's power to assign ERIN a grade.

139. Rather than assigning another coach, BU canceled the final rehearsal of the semester.

140. Mitro and Druckman met with RUSKE regarding his conduct 9 days later, on April 23, 2014.

141. After the meeting, Mitro emailed ERIN to inform her it occurred.

142. Mitro wrote, "We were very clear that you did not wish any additional contact with him regarding your concerns and he indicated that he understood this."

143. The email gave no indication that (1) BU informed RUSKE his conduct was inappropriate; (2) BU intended to provide further training to ensure such conduct

would not be repeated; (3) BU imposed any form of sanction for RUSKE's sexual harassment of ERIN; or (4) BU informed RUSKE of the potential consequences of future, similar behavior.

144.  On May 19, 2014, Erin received an email from Druckman with the results of the Equal Opportunity investigation.

145.  The brief memorandum (the "memo") consisted of four sentences. *See*, Memorandum, attached as Exhibit A.

146.  The two sentences that discussed the result of the investigation read, "My investigation indicated that Mr. Ruske's conduct was inconsistent with BU's policies. I have forwarded the report of my investigation to CFA Dean Benjamin Juarez." ("Juarez")

147.  The memo stated RUSKE's conduct was "inconsistent" with BU's policies, rather than making it clear that RUSKE's conduct was a complete violation of BU's policies against sexual harassment.

148.  The memo failed to disclose specific findings of fact.

149.  The memo failed to describe any response from RUSKE as to ERIN's report of sexual harassment.

150.  ERIN has never received a copy of Druckman's report on her investigation.

151.  Before BU released grades, ERIN contacted Mitro because she did not want RUSKE to assign her a grade for her performance in the ensemble.

152.  ERIN explained that she was not concerned about receiving a poor grade; she did not want to receive a grade from an authority figure that had completely compromised his professionalism.

153. Because of RUSKE's sexual harassment, ERIN did not believe he could objectively evaluate her academic performance.

154. Mitro told her to wait until she received her grade to make such a request.

155. Mitro told ERIN that RUSKE may overcompensate and give ERIN an A.

156. Mitro asked ERIN, "Don't you want an A?"

157. ERIN wanted a grade provided by a faculty member other than RUSKE: a professor that sexually harassed ERIN for two months and knew ERIN reported the sexual harassment to BU.

158. ERIN received a B in the course.

159. Two other students participated in this ensemble.

160. ERIN and Professor Roe emailed Mitro and Dean ad interim Richard Cornell ("Cornell") about the grade.

161. Cornell reviewed the grades RUSKE provided to other students and informed ERIN that—based on the other grades, not ERIN's academic performance—she received the appropriate grade.

162. Cornell informed ERIN that, because of the difficult situation, she may either retake the course in the fall, with the fall grade applying retroactively, or delete the course from her record.

163. Professor Roe contacted Cornell and again emphasized ERIN was not concerned with the letter grade itself, but its source, RUSKE.

164. Around this time, Mitro told ERIN that, because RUSKE gave all students B's, RUSKE had not clearly retaliated against ERIN.

165. ERIN retook the course in fall 2014 with a different professor.

166. ERIN received an A.

167. RUSKE's evaluation of ERIN shows that RUSKE either retaliated against ERIN or had previously showered her with praise in the hopes of receiving sexual favors.

    i.    RUSKE praised ERIN's ensemble performance, work ethic, and intellect during the semester.

    ii.    RUSKE did not provide this praise to ERIN's peers, but assigned ERIN a B, the same grade as the other musicians in the ensemble.

    iii.    Such conduct shows RUSKE retaliated against ERIN because she rejected his sexual advances and reported his inappropriate conduct.

    iv.    Alternatively, if ERIN's performance warranted a B, RUSKE praised her ensemble performance, work ethic, and intelligence as a means grooming ERIN for sexual contact.

168. In July 2014, MARIA contacted Dean of Students Kenneth Elmore ("Elmore") because of the ineffectual response of the School of Music to RUSKE's harassment.

169. On July 9, 2014, MARIA met with Elmore to discuss RUSKE.

170. MARIA provided the text messages and emails from RUSKE that documented his sexual harassment.

171. Elmore, while sympathetic, did not provide any assurances that RUSKE would be reprimanded.

172. When MARIA told Elmore she worried RUSKE would continue to harass other young women, Elmore referred her to Randall.

173. Mitro and Druckman contacted MARIA on July 10, 2014, before MARIA contacted Randall.

174. Mitro and Druckman met with MARIA on July 17, 2014 to discuss RUSKE's sexual harassment.

175. MARIA detailed, in full, RUSKE's sexual harassment and provided the text message and email documentation.

176. MARIA disclosed RUSKE's request for pornographic photographs, subsequent apology, and comparison of MARIA's trumpet performance to sexual intercourse between MARIA and RUSKE.

177. Despite these disclosures, Mitro and Druckman were not receptive to MARIA's report of harassment.

178. Mitro appeared more concerned for RUSKE than for MARIA.

179. Mitro suggested to MARIA that, because of RUSKE's "vibrant" personality, he did not understand his conduct was inappropriate.

180. Mitro and Druckman told MARIA they would speak to RUSKE, but his privacy rights prohibited BU from informing MARIA of any sanctions imposed on RUSKE.

181. MARIA never received any requests for further information or any notice of the outcome of her complaint of harassment.

182. In the following months, ERIN became frustrated with BU's lack of response to RUSKE's harassment and contacted Randall.

183. Through several conversations around May 2015, Randall, told ERIN that her complaint of sexual harassment had been consolidated with MARIA's complaint of sexual harassment.

184. Neither ERIN nor MARIA received official documentation of the consolidation of their complaints or sanctions imposed on RUSKE.

185. During these conversations, Randall told ERIN that RUSKE was a "known offender on campus."

186. Randall also told ERIN that Juarez spoke with RUSKE about the conduct, but provided no information of sanctions imposed on RUSKE.

187. BU selected Lynne Allen ("Allen") as Interim Dean of the CFA after Juarez departed from BU in the spring of 2015.

188. In the summer of 2015, Allen contacted ERIN because she was aware of ERIN's dissatisfaction with BU's response to ERIN's report of harassment.

189. Allen and ERIN spoke on the telephone.

190. During this conversation, Allen told ERIN that BU took her complaint of sexual harassment seriously.

191. ERIN told Allen that the consolidation of the two complaints against RUSKE was inappropriate because they were different instances of harassment.

192. ERIN expressed concern that these two complaints and information she received from other students about RUSKE's similar behavior indicated RUSKE has frequently targeted young women over a period of years.

193. ERIN gave Allen information about other sexual harassment within the School of Music, including the sexual misconduct of Marquez.

194. ERIN told Allen about a rumored sexual relationship between RUSKE and a student during the 2014-2015 academic year.

195. Allen told ERIN she could not take any further action on the handling of ERIN's complaint because she could not change the action taken by a previous dean.

196. Allen told ERIN that she could not investigate any reported rumors of sexual misconduct.

197. During fall 2015, the psychological effects of the sexual harassment began to affect ERIN's academic performance.

198. In November 2015, ERIN requested an extension on one of her assignments.

199. ERIN's professor granted the request and inquired on the necessity.

200. Based on their exchange, ERIN believed the professor had additional information about RUSKE's harassment of ERIN and BU's response.

201. ERIN requested a meeting with Allen to inquire about the information given to professors.

202. At the meeting, ERIN and Allen discussed RUSKE's harassment of ERIN once again.

203. ERIN explained that BU's handling of her complaint with another was not appropriate.

204. ERIN explained that RUSKE's harassment of ERIN and MARIA were two instances of a distinct pattern of conduct, which should be handled separately.

205. Allen told ERIN, "I don't want to rehash the past."

206. At the close of the meeting, Mitro told ERIN she would contact her via email about ERIN's concerns on the information available to faculty members about her complaint against RUSKE.

207. ERIN did not receive an email or any other communication from Mitro.

208. BU's response to MARIA and ERIN's reports of sexual harassment was clearly unreasonable in light of known circumstances.

209. Several faculty members in the School of Music, including RUSKE, have histories of sexual misconduct.

210. Such faculty members know BU will not impose any meaningful sanctions for sexual misconduct.

211. BU's failure to impose these sanctions signals to faculty members, including RUSKE, that BU condones such behavior, so sexual misconduct is repeated.

212. At present, RUSKE is Professor of Horn at BU and Director of Horn Seminar at BU's Tanglewood Institute.

213. RUSKE attracts grant money, enjoys an international reputation of excellence as a musician, and holds tenure, so BU does not appropriately address RUSKE's sexual misconduct.

214. RUSKE intended his actions toward ERIN, MARIA, and other young, female students.

215. RUSKE, aware of his position of power, understood his conduct violated sexual harassment policies and was beyond all possible bounds of decency.

216. RUSKE continually engaged in sexual harassment with the hope of initiating a sexual relationship with ERIN, MARIA, and other young, female students.

217. RUSKE only apologized to students in an effort to discourage them from reporting the sexual harassment to BU.

218. Defendants' actions altered and worsened the condition of ERIN's educational environment.

219. ERIN worries that she will encounter RUSKE on campus.

220. ERIN has considered discontinuing her study of music.

221. Because of BU's ineffectual response to RUSKE's harassment, ERIN understands that BU will not protect her from RUSKE or students and faculty like RUSKE.

222. As a result of the sexual harassment, ERIN suffers from psychological injuries:

    i.    Fears walking alone, especially in dark areas, places with men, open spaces, and enclosed areas;

    ii.    Fears of intruders or dangers in her dormitory;

    iii.    Hypervigilance;

    iv.    Avoidance of places where she may encounter RUSKE;

    v.    Sense of betrayal;

    vi.    Strong sense of guilt and shame;

    vii.    Difficulty concentrating and dissociation after encountering RUSKE or other reminders of the sexual harassment;

    viii.    Suffers from sexually disturbing and violent nightmares, often involving RUSKE, which include stalking, harassment, touching, and rape;

    ix.    Insomnia as a result of stress caused by BU's response to ERIN's complaint, fears of retaliation, anticipation of nightmares involving RUSKE, and concerns for safety; and

    x.    Physically shaking in response to feelings of fear and stress.

23

223.  ERIN continues to require therapy to address the effects of RUSKE's sexual harassment.

224.  Since the sexual harassment by RUSKE, ERIN cannot share a dormitory room because of the resulting hypervigilance.

225.  Defendants' actions altered and worsened the condition of MARIA's educational environment.

226.  MARIA currently studies music at a neighboring university.

227.  Music students at this institution commonly attend the same events, including concerts and master classes, as BU students.

228.  MARIA worries that she will encounter RUSKE at an educational event at her university, BU, or at another venue in Boston.

229.  MARIA has skipped events at BU that would benefit her music education because she reasonably believes RUSKE will be in attendance.

230.  MARIA struggles to maintain interest in her undergraduate major, trumpet performance, because most of her instructors and peers are male.

231.  Because of BU's ineffectual response to RUSKE's harassment, MARIA understands that BU will not protect her from RUSKE or students and faculty like RUSKE.

232.  As a result of the sexual harassment, MARIA suffers from psychological injuries:

      i.     Experiences an exaggerated startle response;

     ii.     Fears going on or near BU's campus;

    iii.     Avoids BU because of its link to the harassment;

    iv.     Feels betrayed by authority figures;

      v.      Experiences periods of disinterest in her music studies;

      vi.     Questions whether or not men view her only as a sexual object; and

      vii.    Struggles to trust others, particularly older men in positions of power.

233. As a result of the sexual harassment, MARIA has previously suffered from the following psychological injuries:

      i.      Feelings of guilt;

      ii.     Feelings of shame; and

      iii.    Disturbing and intrusive memories.

234. When MARIA became anxious or upset as a result of RUSKE's harassment, she experienced an elevated heart rate, shortness of breath, and tightening in her chest.

235. In therapy MARIA has addressed the effects of RUSKE's sexual harassment.

236. The negligence and deliberate indifference of BU allowed RUSKE, an instructor under its supervision and control, to sexually harass numerous young, female students, including ERIN and MARIA, over a period of many years.

237. As a result of BU's severe failures and deliberate indifference, RUSKE sexually harassed ERIN and MARIA.

238. BU is an educational institution as defined by Title IX, which receives federal financial assistance.

239. BU receives federal funds through federal student aid and federal grants. As a result, even if it were not obliged to do so under state law, BU was required to adopt and implement sexual harassment policies under Title IX.

240. BU intentionally created a long-standing systematic hostile sexual environment of sexual harassment by professors despite repeated actual notice of sexual harassment by engaging in:

    i.    A pattern and conspiracy of deliberate acts without regard to the known risks of condoning sexual harassment by a systemic failure to investigate sexual harassment by faculty members in a manner consistent with BU and/or OCR policies, failing to discipline faculty members found to have committed acts of sexual harassment, and failing to disclose results of investigations within 60 days, if at all.

    ii.    A pattern of deliberate acts without regard to the known risks of giving special and favorable treatment to esteemed faculty, such as those described in paragraph 239(i), which creates a culture where faculty members understand they may engage in sexual harassment with little to no consequences to their employment at BU or their careers.

    iii.    A pattern of deliberate acts, without regard to the known risks, of unreasonably failing to take prompt, adequate, and effective remedial actions and measures to remedy a substantial known risk of sexual harassment by faculty members.

241. ERIN was a BU student who was subjected to harassment based on her gender. This harassment was sufficiently severe and pervasive to create an abusive educational environment and persisted as a result of the deliberate indifference of staff at every level of authority.

  i. ERIN suffered extraordinary harm due to the repeated sexually harassing conduct of RUSKE.

  ii. Randall, BU's Title IX Coordinator, identified RUSKE as a "known offender," referring to his sexual harassment of female students.

  iii. Administrators at BU had actual notice of RUSKE's propensity to sexually harass young, female students, prior to RUSKE's harassment of ERIN through reports of such behavior, which BU consistently attributed to RUSKE's personality.

  iv. BU created a sexually hostile environment by failing to prevent, address, or correct RUSKE's sexual harassment of ERIN.

  v. BU's failure to correct and address known sexual harassment—failing to provide meaningful sanctions, up to and including termination of employment, or prevent retaliation against ERIN—was clearly unreasonable in light of known circumstances.

  vi. BU's response to the sexual harassment was sufficiently severe, pervasive, and objectively offensive, and so undermined and detracted from ERIN's educational experience that ERIN was effectively denied equal access to educational resources, benefits, and opportunities.

242. MARIA was a BU student who was subjected to harassment based on her gender. This harassment was sufficiently severe and pervasive to create an abusive educational environment and persisted as a result of the deliberate indifference of staff at every level of authority.

    i.    MARIA suffered extraordinary harm due to the repeated sexually harassing conduct of RUSKE.

    ii.    Randall, BU's Title IX Coordinator, identified RUSKE as a "known offender," referring to his sexual harassment of female students.

    iii.    Administrators at BU had actual notice of RUSKE's propensity to sexually harass young, female students, prior to RUSKE's harassment of MARIA through reports of such behavior, which BU consistently attributed to RUSKE's personality.

    iv.    BU created a sexually hostile environment by failing to prevent, address, or correct RUSKE's sexual harassment of MARIA.

    v.    BU's failure to correct and address known sexual harassment— failing to provide meaningful sanctions, up to and including termination of employment—was clearly unreasonable in light of known circumstances.

    vi.    BU's response to the sexual harassment was sufficiently severe, pervasive, and objectively offensive, and so undermined and detracted from MARIA's educational experience that MARIA was effectively denied equal access to educational resources, benefits, and opportunities.

28

243. BU violated the requirements of Title IX by the following acts and omissions, all of which were conducted, and/or failed to be conducted, in reckless and deliberate indifference to the risk of harm posed to Plaintiffs:

  i. Failing to adopt and publish an appropriate grievance procedure for the prompt and equitable resolution of sexual harassment and sex discrimination complaints in violation of Title IX;

  ii. Failing to comply with their own explicit policy banning sexual harassment upon students;

  iii. Failing to reasonably respond to reports of RUSKE's earlier sexual harassment of young, female students, which would have prevented the sexual harassment of Plaintiffs MARIA and ERIN;

  iv. Taking steps known or which should have been known to be ineffectual in eliminating RUSKE's sexual harassment of young, female students;

  v. Failing to take immediate and appropriate corrective actions to remedy the known harassment by RUSKE following the complaints of Plaintiffs ERIN and MARIA;

  vi. Attributing RUSKE's sexual harassment to an immutable characteristic of his personality that BU—and the young, female students exposed to RUSKE—must accept;

  vii. Informing at least two victims of RUSKE's sexual harassment that he may not have understood the impropriety of his actions;

viii.    Failing to notify Plaintiffs ERIN and MARIA of their right to contact local law enforcement;

ix.    Failing to disclose mental health services available to victims of sexual harassment to Plaintiffs ERIN and MARIA;

x.    Continuing to assign RUSKE to teach young, female musicians, in BU's undergraduate program, graduate program, and Tanglewood Institute;

xi.    Failing to protect ERIN from RUSKE's retaliatory conduct after she made her complaint of RUSKE's sexual harassment;

xii.    Combining two distinct instances of sexual harassment into one disciplinary action in order to minimize sanctions against RUSKE;

xiii.    Failing to provide basic details to ERIN in the Equal Opportunity investigation memo;

xiv.    Failing to provide MARIA with a written notice of the outcome of her complaint;

xv.    Failing to officially conduct and conclude an investigation into MARIA's complaint in the nearly three years since her initial complaint in January 2013;

xvi.    Maintaining strict confidentiality to the benefit of RUSKE, despite overwhelming evidence that RUSKE sexually harassed ERIN, MARIA, and numerous other students;

       xvii.   Failing to assure ERIN and MARIA that BU will take steps to prevent the recurrence of any harassment and to correct its discriminatory effects on ERIN, MARIA, and others victims;

      xviii.  Failing to adopt a "zero tolerance" policy for sexual harassment; and

      xix.   Failing to give adequate training to staff members in Title IX requirements to protect against sexual harassment.

244. BU's conduct rises to the level of deliberate indifference, which encompasses BU's negligence.

245. BU knew or, in the exercise of reasonable care, should have known that RUSKE was not fit for a position in which he would be working with young, female music students.

246. BU failed to train RUSKE properly to perform his duties as a music professor.

247. BU knew or, in the exercise of reasonable care, should have known the full extent of RUSKE's sexual harassment of young, female students, yet retained RUSKE and failed to provide adequate supervision.

### COUNT 1

**Plaintiff ERIN SHYR's Title IX Claim Against TRUSTEES OF BOSTON UNIVERSITY**

248. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

249. Defendant TRUSTEES OF BOSTON UNIVERSITY violated Plaintiff ERIN SHYR's rights as a resident of the United States under 20 U.S.C. §§1681-1686.

31

250. Plaintiff ERIN SHYR was a student subject to sexual harassment, which was based upon sex. This harassment was sufficiently severe and pervasive to create an abusive educational environment.

251. A cognizable basis for liability against TRUSTEES OF BOSTON UNIVERSITY exists as this educational institution receives federal funds, had actual notice of Defendant ERIC RUSKE's harassment of Plaintiff ERIN SHYR, and was deliberately indifferent to this harassment, both before and after the harassment occurred.

252. Specifically, TRUSTEES OF BOSTON UNIVERSITY were deliberately indifferent to Defendant ERIC RUSKE's sexual harassment of Plaintiff ERIN SHYR by receiving actual notice of prior harassment, but failing to prevent the harassment of Plaintiff ERIN SHYR; failing to prevent Defendant ERIC RUSKE from retaliating against Plaintiff ERIN SHYR; and addressing Plaintiff ERIN SHYR's reports of harassment in a manner clearly unreasonable in light of known circumstances.

253. Such deliberate indifference places Plaintiff ERIN SHYR—as well as other similarly vulnerable students—at risk of sexual harassment by Defendant ERIC RUSKE.

## COUNT 2

### Plaintiff MARIA CURRIE's Title IX Claim
### Against TRUSTEES OF BOSTON UNIVERSITY

254. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

32

255. Defendant TRUSTEES OF BOSTON UNIVERSITY violated Plaintiff MARIA CURRIE's rights as a resident of the United States under 20 U.S.C. §§1681-1686.

256. Plaintiff MARIA CURRIE was a student subject to sexual harassment, which was based upon sex. This harassment was sufficiently severe and pervasive to create an abusive educational environment.

257. A cognizable basis for liability against TRUSTEES OF BOSTON UNIVERSITY exists as this educational institution receives federal funds, had actual notice of Defendant ERIC RUSKE's harassment of Plaintiff MARIA CURRIE, and was deliberately indifferent to this harassment, both before and after the harassment occurred.

258. Specifically, TRUSTEES OF BOSTON UNIVERSITY were deliberately indifferent to Defendant ERIC RUSKE's sexual harassment of Plaintiff MARIA CURRIE by receiving actual notice of prior harassment, but failing to prevent the harassment of Plaintiff MARIA CURRIE and addressing Plaintiff MARIA CURRIE's reports of harassment in a manner clearly unreasonable in light of known circumstances.

259. Such deliberate indifference places Plaintiff MARIA CURRIE—as well as other similarly vulnerable students—at risk of sexual harassment by Defendant ERIC RUSKE.

## COUNT 3

**Plaintiff ERIN SHYR's Negligent Hiring, Training, Supervision, and Retention Claim Against Defendant TRUSTEES OF BOSTON UNIVERSITY**

260. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

261. Defendant TRUSTEES OF BOSTON UNIVERSITY owed a duty of care to protect Plaintiff ERIN SHYR from sexual harassment, which was unwarranted, unwanted, and improper.

262. Defendant TRUSTEES OF BOSTON UNIVERSITY breached its duty of care in its hiring, training, supervision, and retention of Defendant ERIC RUSKE—an employee that Defendant TRUSTEES OF BOSTON UNIVERSITY knew or, in the exercise of reasonable care, should have known—was unfit to work with young, female musicians.

263. As a result of Defendant TRUSTEES OF BOSTON UNIVERSITY's breach, Plaintiff ERIN SHYR was sexually harassed.

264. ERIN SHYR suffered humiliation, severe emotional distress, and permanent psychological damages.

265. She has incurred expenses and will likely incur future expenses for medical and psychological treatment.

### COUNT 4

**Plaintiff MARIA CURRIE's Negligent Hiring, Training, Supervision, and Retention Claim Against Defendant TRUSTEES OF BOSTON UNIVERSITY**

266. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

267. Defendant TRUSTEES OF BOSTON UNIVERSITY owed a duty of care to protect Plaintiff MARIA CURRIE from sexual harassment, which was unwarranted, unwanted, and improper.

268. Defendant TRUSTEES OF BOSTON UNIVERSITY breached its duty of care in its hiring, training, supervision, and retention of Defendant ERIC RUSKE—an employee that Defendant TRUSTEES OF BOSTON UNIVERSITY knew or, in the exercise of reasonable care, should have known—was unfit to work with young, female musicians.

269. As a result of Defendant TRUSTEES OF BOSTON UNIVERSITY's breach, Plaintiff MARIA CURRIE was sexually harassed.

270. MARIA CURRIE suffered humiliation, severe emotional distress, and permanent psychological damages.

271. She has incurred expenses and will likely incur future expenses for medical and psychological treatment.

## COUNT 5

### Plaintiff ERIN SHYR's Negligent Infliction of Emotional Distress Claim Against Defendant ERIC RUSKE

272. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

273. Defendant ERIC RUSKE as Plaintiff ERIN SHYR's music professor owed her a duty of care, which he breached through sexually harassing her, which was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community

35

274. This breach reasonably caused Plaintiff ERIN SHYR emotional distress of a nature so severe that no reasonable person could be expected to endure it.

### COUNT 6

### Plaintiff MARIA CURRIE's Negligent Infliction of Emotional Distress Claim Against Defendant ERIC RUSKE

275. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

276. Defendant ERIC RUSKE as Plaintiff MARIA CURRIE's music professor owed her a duty of care, which he breached through sexually harassing her, was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

277. This breach reasonably caused Plaintiff MARIA CURRIE emotional distress of a nature so severe that no reasonable person could be expected to endure it.

### COUNT 7

### Plaintiff ERIN SHYR's Intentional or Reckless Infliction of Emotional Distress Claim Against Defendant ERIC RUSKE

278. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

279. Defendant ERIC RUSKE intended to inflict emotional distress or, he knew or should have known that emotional distress was the likely result of his conduct, when he sexually harassed Plaintiff ERIN SHYR.

280. Defendant ERIC RUSKE's conduct—which included using his position of authority to have physical contact with and attempting to solicit pornographic photographs of a student 31 years his junior—was extreme and outrageous,

beyond all possible bounds of decency, and utterly intolerable in a civilized community.

281. Defendant ERIC RUSKE's conduct caused Plaintiff ERIN SHYR distress of a nature so severe that no reasonable person could be expected to endure it.

### COUNT 8

### Plaintiff MARIA CURRIE's Intentional or Reckless Infliction of Emotional Distress Claim Against Defendant ERIC RUSKE

282. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

283. Defendant ERIC RUSKE intended to inflict emotional distress or, he knew or should have known that emotional distress was the likely result of his conduct, when he sexually harassed Plaintiff MARIA CURRIE.

284. Defendant ERIC RUSKE's conduct—which included analogizing an academic musical performance to Defendant ERIC RUSKE engaging in sexual intercourse with Plaintiff MARIA CURRIE as well as attempting to solicit pornographic photographs of Plaintiff MARIA CURRIE, a student 30 years his junior—was extreme and outrageous, beyond all possible bounds of decency, and utterly intolerable in a civilized community.

285. Defendant ERIC RUSKE's conduct caused Plaintiff MARIA CURRIE distress of a nature so severe that no reasonable person could be expected to endure it.

### COUNT 9

### Plaintiff ERIN SHYR's Battery Claim Against Defendant ERIC RUSKE

286. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

287. Defendant ERIC RUSKE battered Plaintiff ERIN SHYR by intentionally engaging in harmful and offensive sexual conduct with her that was neither consensual nor privileged.

## COUNT 10

**Plaintiff ERIN SHYR's Assault Claim Against Defendant ERIC RUSKE**

288. Plaintiff realleges and incorporates herein the allegations contained in each and every other paragraph of this Complaint.

289. Defendant ERIC RUSKE assaulted Plaintiff ERIN SHYR by placing her in fear that he would engage in or attempt to engage in unlawful sexual conduct.

## RELIEF REQUESTED

The plaintiffs demand judgment against the defendants on each of the Counts stated, jointly and severally, in an amount which is fair, just, and adequate for the injuries and damages sustained, and the pain and suffering endured, plus punitive and exemplary damages where allowed by law, plus interest and costs, and reasonably attorneys' fees where allowed by law.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL COUNTS.

By their Attorneys,

CARMEN L. DURSO, ESQUIRE
BBO # 139340
Law Office of Carmen L. Durso
175 Federal Street, Suite 1425
Boston, MA 02110-2287
617-728-9123 / carmen@dursolaw.com

SARA ELIZABETH BURNS, ESQUIRE
BBO # 692115
Law Office of Sara Elizabeth Burns
175 Federal Street, Suite 1425
Boston, MA 02110-2287
617-767-2710 / sara@seburnslaw.com
April 11, 2016



| TO: | Erin Shyr |
| FROM: | Eleanor Druckman, Assistant Director of Equal Opportunity |
| RE: | Complaint regarding Eric Ruske |
| DATE: | May 19, 2014 |

Thank you for meeting with me and Dean Patricia Mitro to discuss your concerns about Professor Eric Ruske. My investigation indicated that Mr. Ruske's conduct was inconsistent with BU's policies. I have forwarded the report of my investigation to CFA Dean Benjamin Juarez.

If you have any questions, please feel free to contact me.

cc:     Patricia Mitro

EX. A