UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| ERIN SHYR and <br> MARIA CURRIE, <br><br>         Plaintiffs, <br><br> v. <br><br> TRUSTEES OF BOSTON <br> UNIVERSITY AND ERIC RUSKE, <br><br>         Defendants. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> )     Civil Action No. 16-11124 <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) |

## MEMORANDUM AND ORDER

**CASPER, J.**                                                                                           **March 13, 2017**

### I.   Introduction

Plaintiffs Erin Shyr and Maria Currie have filed this lawsuit against Defendants Trustees of Boston University (the "University") and Eric Ruske ("Ruske") (collectively, "Defendants") alleging a violation of Title IX, 20 U.S.C. § 1681, and various Massachusetts state law claims. D. 1-2. Defendants have moved to dismiss five of the ten counts asserted by Plaintiffs. D. 6. For the reasons stated below, the Court DENIES the motion.

### II.  Standard of Review

On a motion to dismiss for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6), the Court "must assume the truth of all well-plead[ed] facts and give plaintiff the benefit of all reasonable inferences therefrom." Ruiz v. Bally Total Fitness Holding Corp., 496 F.3d 1, 5 (1st Cir. 2007) (citing Rogan v. Menino, 175 F.3d 75, 77 (1st Cir. 1999)).

1

Reading the complaint "as a whole," the Court must conduct a two-step, context-specific inquiry. García-Catalán v. United States, 734 F.3d 100, 103 (1st Cir. 2013). First, the Court must perform a close reading of the claim to distinguish the factual allegations from the conclusory legal allegations contained therein. Id. The Court must accept factual allegations as true, while conclusory legal conclusions are not entitled credit. Id. Second, the Court must determine whether the factual allegations present a "reasonable inference that the defendant is liable for the misconduct alleged." Haley v. City of Boston, 657 F.3d 39, 46 (1st Cir. 2011). "[T]he plaintiff need not demonstrate she is likely to prevail" at this stage, only that the claims are facially plausible. García-Catalán, 734 F.3d at 102-03.

### III. Factual Background

The following allegations are from the complaint, D. 1-2, and the Court accepts them as true for the purposes of considering this motion. These allegations primarily concern Ruske, a professional horn soloist, who has been a professor at Boston University's College of Fine Arts since 1990. Id. ¶¶ 21, 25. Over the course of his career, Ruske has gathered a fair number of accolades. Id. at 21-24. In tandem with all of these achievements, however, Shyr and Currie allege that Ruske has also amassed a reputation for making sexually charged and offensive statements to his students, particularly toward women. Id. ¶ 35.

#### A. Ruske's Relationship with Currie

Maria Currie ("Currie") enrolled at the University's College of Fine Arts in September 2012 to study trumpet performance. Id. ¶ 32. As a sophomore, nineteen-year-old Currie joined a chamber ensemble (the "quintet") as part of her coursework. Id. ¶ 33. Ruske was the faculty member in the College of Fine Arts assigned to oversee and coach the quintet. Id. ¶¶ 34, 38. Currie alleges that her interactions with Ruske became increasingly hostile, with Ruske objectifying her

and making unseemly sexual comments to her on numerous occasions. For example, on November 16, 2013, Currie arrived for rehearsal wearing a knee-length pencil skirt and high heels. Id. ¶ 41. Upon seeing her, Ruske allegedly raised his eyebrows, looked Currie up and down, and exclaimed "Ooh, heels!" Id. ¶¶ 41-42.

On December 16, 2013, Currie was required to play for a panel of three brass faculty members as part of an evaluation for coursework that was separate from her chamber ensemble. Id. ¶ 44. Ruske was one of the faculty member assigned to be on this panel. Id. Currie did not pass the evaluation. Id. ¶ 45. In response, Currie sought out Ruske and requested a meeting to get advice and feedback on her failed performance. Id. ¶ 46. Ruske agreed to meet with Currie and provided Currie with his personal cell phone number to arrange the meeting. Id. ¶ 47. Later that same day, Ruske e-mailed Currie stating, "I will certainly miss hearing and working with you in the quintet next semester (and of course seeing the concert heels)." Id. ¶ 49. Currie did not reply to this e-mail. Id. ¶ 50. The following day, on December 17, 2013, Ruske and Currie met in Ruske's office to discuss Currie's evaluation. Id. ¶ 51. During this meeting, Ruske spoke of Currie's performance by comparing it to the two of them having sex. Id. ¶ 54. Specifically, Ruske told Currie that listening to her performance made him feel like he and Currie were in the midst of sexual intercourse, but that Currie, while beautiful, simply lay there and did nothing to enhance the sexual experience. Id. Currie ended the meeting and left Ruske's office. Id. ¶ 55. Several minutes after this meeting, Ruske texted Currie, "Fabulous chatting . . . and great blouse!" Id. ¶ 57. Currie had not yet received her grade in Ruske's ensemble course and allegedly felt obligated to respond to this text message stating, "[h]ave a great break!" Id. ¶¶ 56, 58, 59. Less than three hours later, Ruske again texted Currie stating, "[w]ithout being too grossly inappropriate. [sic] I hope Santa brings you nice big high heels." Id. ¶ 60. Currie again responded thanking him. Id. ¶

61. Ruske sent back a text saying, "It's such a shame that I won't ever get to see them/you," Id. ¶ 62, to which Currie replied, "I'll be having a recital sometime next semester!" Id. ¶ 64. In response, Ruske sent Currie a text that read, "And the last thing you need is some creepy old guy in the front row," id. ¶ 65, which was followed by another text stating, "You can always send pix . . ." id. ¶ 66. Currie alleges asking for "pix" is a generally accepted practice used by individuals soliciting nude pictures of women. Id. ¶ 68. Currie further alleges that because of the power dynamic that existed between Ruske and Currie, especially given Ruske's control over Currie's grade and Ruske's reputation as an excellent musician, Currie responded, "Ha, no promises[.]" Id. ¶¶ 69-70. Ruske wrote back, "Of course not . . . a girl can dream, though." Id. ¶ 71. At this point, Currie stopped responding to Ruske. Id. ¶ 72.

On December 24, 2013, Ruske sent Currie a text that read, "I probably owe you an apology . . . . I'm really sorry if I made you uncomfortable. Have a fabulous holiday and a happy New Year!!" Id. ¶ 74. Currie did not respond. Id. ¶ 75. In January 2014, Currie withdrew as a student at the University's College of Fine Arts and enrolled at a neighboring university. Id. ¶ 77. Nonetheless, Currie still practiced at the College of Fine Art's facilities. Id. ¶ 78. That month, Currie ran into Ruske while practicing at the College of Fine Arts. Id. ¶ 79. Currie felt uncomfortable, avoided eye contact with Ruske, and left the area. Id. ¶ 80. Subsequently, on January 30, 2014, Currie met with Sarah Bellott ("Bellott"), the College of Fine Art's student services coordinator, and showed her the numerous text messages she had received from Ruske. Id. ¶ 82. Bellott responded by telling Currie that she should have specifically asked Ruske to stop sending the text messages. Id. ¶ 83.

**B.     Ruske's Relationship with Shyr**

In the spring of 2014, Erin Shyr ("Shyr"), a freshman in the University's College of Fine Arts, enrolled in a woodwind chamber group coached by Ruske. Id. ¶ 86. Shyr alleges that Ruske maintained inappropriate interactions with her and directed sexually suggestive comments to her. For example, on March 11, 2014, Ruske emailed Shyr stating that he hoped she was having a good spring break. Id. ¶ 96. Shyr responded that her break was going well and that she wished Ruske a happy spring break as well. Id. ¶ 97. Ruske replied to Shyr, "Hooooray!!! Maybe you'll share a cute pic with me . . . ." Id. ¶ 98. Like Currie, Shyr interpreted Ruske's request for a "pic" as one seeking nude photographs. Id. ¶ 99. Because Shyr was allegedly worried about how Ruske would respond if she failed to send back a picture, Shyr pretended she did not understand the sexually suggestive text. Id. ¶¶ 101-02. Instead, she wrote back, "I haven't taken many pictures in NYC, but here is a picture of my sister and I after her concert, and the other is a picture of a stray cat we fed leftovers to!" Id. Ruske responded, "Forgive me for being a bit prejudiced, but although your sister and the kitty . . . are cute, you are amazing and do have something truly unique. Please don't be offended by [sic] honesty . . . as I think you already know, I am rather blunt. Thanks for sharing . . . I like that." Id. ¶ 103. Shyr's response to this email stated, "Thank you sir, that's very kind of you. I hope you have a good evening." Id. ¶ 104. Shyr further alleges that around this time Ruske began to hug her and give her kisses on the cheek when he would run into her. Id. ¶¶ 108-09. When hugging her he often also grazed his hand across her lower back. Id. ¶ 110.

On March 20, 2014, Ruske sent Shyr an e-mail after rehearsal stating, "You are so damn bright and also wicked adorable. Tough to be insistent when you're the lowest rung on the ladder (age-wise), but it's great training for you." Id. ¶ 113. Shyr replied, "Thank you, sir. I will continue

to work hard in chamber class." Id. ¶ 114.  Ruske immediately emailed Shyr back saying "I prefer, "[T]hanks [E]ric, for the inappropriate comments." Id. ¶ 115.

These types of email exchanges between Ruske and Shyr continued and, each time, they caused Shyr fear and anxiety.  See id. ¶¶ 117-119.  Shyr discussed the e-mails with her mentor, a professional musician living in Georgia, who informed her that Ruske had a national reputation for harassing young women. Id. ¶ 121.  The mentor advised Shyr to stay away from Ruske. Id. ¶ 122.  This, however, was quite difficult because Ruske was Shyr's teacher and had direct control over her grade in his course. Id. ¶ 119.

Shyr's interactions with Ruske prompted her to contact a faculty member she trusted to discuss what had been transpiring, and that faculty member connected Shyr with Patricia Mitro ("Mitro"), the College of Fine Art's Deputy Title IX Coordinator. Id. ¶¶ 126-27.  Shyr and Mitro met on April 14, 2014 and Mitro informed Shyr that Ruske's behavior constituted sexual harassment under Title IX. Id. ¶ 136.  Mitro, however, also informed Shyr that it was possible that Ruske did not realize he had violated the University's Title IX policies and, instead, she blamed his actions on his "vibrant and effusive" personality. Id. ¶ 137.  Given these circumstances, Mitro declined to remove Ruske as Shyr's ensemble instructor and did not remove Ruske's ability to assign Shyr a grade. Id. ¶ 138.

### C. Subsequent Events

In response to Shyr's complaints about Ruske, the College of Fine Arts initiated an Equal Opportunity investigation to evaluate his conduct. Id. ¶ 144.  The memorandum summarizing the results of the investigation, which was released in May 2014, "indicated that Mr. Ruske's conduct was inconsistent with BU's policies" and that the memorandum had been forwarded to CFA Dean Benjamin Juarez. Id. ¶ 146; Exh. A.

In July 2014, Currie contacted the University's Dean of Students, Kenneth Elmore ("Elmore"), to follow up on her reporting of the various e-mails and text messages she received from Ruske. Id. ¶ 168. While sympathetic, Elmore made no promise to reprimand Ruske even after Currie expressed fear that Ruske might sexually harass other young women. Id. ¶ 172.

In May 2015, Shyr was informed that her complaints toward Ruske had been consolidated with Currie's, though the two women did not know each other. Id. ¶¶ 134, 183. While Shyr made clear she felt the consolidation of completely separate sexual assault incidents was inappropriate, the University's administration did not disentangle their investigation of the separate reports by two different students. Id. ¶ 204. Around this time, the University's Title IX Coordinator, Kim Randall ("Randall"), also allegedly informed Shyr that Ruske was a "known offender on campus." Id. ¶ 185. No official action or reprimand is alleged to have taken by BU against Ruske. See id. ¶ 210. Both Shyr and Currie allege that they have suffered significant psychological harm as a result of Ruske's sexual harassment including feelings of guilt, shame, and inability to trust others. Id. ¶¶ 222, 232. Moreover, Currie also alleges physical harm as a result of the harassment, including an elevated heart rate, shortness of breath, and a tightening of her chest whenever forced to recount Ruske's actions. Id. ¶ 234.

**IV.  Procedural History**

Plaintiffs instituted this action in Suffolk Superior Court on April 11, 2016. D. 1-2. Defendants removed the case to this Court on June 15, 2016. D. 1. Defendants have now moved to dismiss Counts IV, VII, VIII, IX, and X under Fed. R. Civ. P. 12(b)(6).[1] D. 6. The Court heard the parties on the pending motion and took the matter under advisement. D. 15.

---

[1] Defendants fleetingly mention Fed. R. Civ. P. 8(a)(2) in the introduction of their motion to dismiss, stating "the [c]omplaint—all 39 pages and 289 paragraphs—blatantly ignores the

**V.     Discussion**

    **A.     Negligent Hiring, Training, Supervision and Retention (Count IV)**

Currie alleges that the University was negligent in its hiring, training, supervision and retention of Ruske and that it breached its duty of care to her because it "knew or, in the exercise of reasonable care, should have known [that Defendant Ruske] was unfit to work with young, female musicians." D. 1-2 ¶¶ 262, 268. "Negligent retention [or supervision] occurs when, during the course of employment, the employer becomes aware or should have become aware of problems with an employee that indicated his unfitness, and the employer fails to take further action such as investigating, discharge or reassignment." Foster v. Loft, Inc., 26 Mass. App. Ct. 289, 291 (1988) (internal citations and quotation marks omitted). As the court in Foster explained:

> An employer must use due care to avoid the selection or retention of an employee whom he knows or should know is a person unworthy, by habits, temperament, or nature, to deal with the persons invited to the premises by the employer. The employer's knowledge of past acts of impropriety, violence, or disorder on the part of the employee is generally considered sufficient to forewarn the employer who selects or retains such employee in his service that he may eventually commit an assault, although not every infirmity of character, such, for example, as dishonesty or querulousness, will lead to such result.

Id. (internal citations and quotation marks omitted). In evaluating a claim for negligent hiring, retention or supervision, the Court must examine the totality of the circumstances in determining whether it was reasonably foreseeable that an employee would cause harm to a plaintiff. Coughlin v. Titus & Bean Graphics, Inc., 54 Mass. App. Ct. 633, 639 (2002). Under Massachusetts law, an employee's reputation may indicate that misconduct on the part of an employee is foreseeable. See Carson v. Canning, 180 Mass. 461, 463 (1902) (Holmes, J.) (explaining that "[r]eputation is

---

admonition of Fed. R. Civ. P. 8(a)(2) that it contain 'a short and plain statement of the claim,'" D. 6-1 at 1, but they neither move to dismiss under that rule nor argue in support of dismissing under that rule. Accordingly, the Court only considered the motion to dismiss under Rule 12(b)(6).

let in . . . to show that the defendant might or ought to have known the reputed fact"), cited with approval in Foster, 26 Mass. App. Ct. at 290 & n.3.

Defendants argue that the Court should dismiss this claim because Ruske's unsuitability to work with young, female musicians rests entirely upon Currie's allegations that he had developed "a reputation for making offensive, vulgar, and sexually charged statements to students," and that the University was aware of this reputation. D. 1-2 ¶ 35; D. 6-1 at 9. The mere existence of a negative reputation, Defendants continue, is not a sufficient basis to put the University on notice of Ruske's propensity to commit sexual harassment. D. 6-1 at 9. Thus, according to Defendants, Currie has not met her burden of demonstrating the foreseeability requirement of a negligent supervision claim. Id. at 11. To support this point, Defendants rely upon Liu v. Striuli, 36 F. Supp. 2d 452, 468 (D.R.I. 1999). There, the district court held that a "meager rumor" about an employee's personality or past conduct could not adequately inform the employer of that person's unfitness to do his job or propensity to engage in unacceptable behavior. See id. In Liu, a graduate student alleged that she was the victim of a harassment at the hands of an employee of Providence College and contended that the college was negligent in its supervision of the alleged harasser. Id. at 458. At summary judgment, the district court held that the graduate student's claim failed because the graduate student rested "her entire cause of action for negligent supervision on one meager rumor: a deposition statement by [a professor] describing a conversation he had with the President of the College when Liu's allegations had first come to light." Id. at 468. At the deposition, "[the professor] claimed that the President of the College acknowledged that 'there had been earlier complaints' about [the alleged harasser]." Id. Beyond this one fact, nothing else in the record supported the notion that Providence College should have been aware of its employee's propensity to harass students. The Liu court found that such a "fragmentary bit of hearsay []

9

entirely lacking in content and context" could not properly support a negligent supervision claim, especially where "[t]he nature of the alleged [prior] complaints is unknown as well as their timing, seriousness, and number." Id.

At this juncture, however, the Court is addressing Defendants' motion to dismiss, not a motion for summary judgment after the completion of discovery. Currie has alleged that by the time she enrolled in Ruske's class, he "had developed a reputation for making offensive, vulgar, and sexually charged statements to students, both during group rehearsals as well as one-on-one encounters." D. 1-2 ¶ 35. The complaint further alleges that "knowledge of Ruske's sexual harassment of young musicians extended beyond BU's campus; Ruske was known in the music industry for sexually harassing young women." Id. According to the complaint, the University allegedly was also aware of Ruske's behavior and his reputation for same. From the factual allegations put forth in the complaint, and in light of applicable Massachusetts law, Currie has sufficiently pled the requisite elements of a negligent supervision claim.

Defendants also rely on Frederick v. Simpson Coll., 149 F. Supp. 2d 826, 826 (S.D. Iowa 2001) in arguing for dismissal of the negligent supervision claim. There, the court dismissed a student's Title IX sexual harassment claim at the summary judgment stage because the school's knowledge that a faculty member used "profanity and other questionably vulgar language in his classroom" was insufficient to notify the college that he was "at risk of sexually harassing a student." Id. at 837-38. Defendants contend that like in Fredrick, the Court should dismiss Currie's claim because "the absence of any linkage between the University's knowledge of undefined, inappropriate comments and sexual harassment is fatal to [her] cause of action for negligent supervision." D. 6-1 at 11. Defendants' reliance on Frederick is unavailing, however, because Frederick is inapplicable to a negligent supervision claim. To succeed on a Title IX

claims, like the one being addressed in Frederick, a Plaintiff must allege that "an official who at a minimum has authority to address the alleged discrimination and to institute corrective measures on the recipient's behalf has actual knowledge of discrimination in the recipient's programs and fails adequately to respond." Gebser v. Lago Vista Ind. Sch. Dist., 524 U.S. 274, 290 (1998). This actual knowledge requirement is a higher threshold than negligence's foreseeability requirement, and cannot be met by *respondeat superior* or constructive notice. Id. at 285 (concluding that "it would 'frustrate the purposes' of Title IX to permit a damages recovery against a school district for a teacher's sexual harassment of a student based on principles of *respondeat superior* or constructive notice, i.e., without actual notice to a school district official"). Thus, Currie is not required to allege the University's actual knowledge of Ruske's reputation, only that his harassment of a student was foreseeable in light of that reputation. Currie has met her burden in the operative complaint.

For all these reasons, the Court DENIES Defendants' motion to dismiss Count IV.

### B.     Intentional Infliction of Emotional Distress (Counts VII and VIII)

Under Massachusetts law, a claim for intentional infliction of emotional distress requires Currie and Shyr to show that (1) Ruske intended to inflict emotional distress, or knew or should have known that emotional distress was likely to result based on his conduct; (2) Ruske's conduct was extreme and outrageous; (3) Ruske's actions caused them distress; and (4) the emotional distress suffered by Currie and Shyr was severe and of a nature that no reasonable person could be expected to endure it. See Gouin v. Gouin, 249 F. Supp. 2d 62, 73 (D. Mass. 2003) (citing Agis v. Howard Johnson Co., 371 Mass. 140, 144-45 (1976)). The analysis of such a claim often turns on the second element: whether the conduct was extreme and outrageous. Baez v. Maloney, No. 05-cv-11045-GAO, 2007 WL 2769785, at *4 (D. Mass. Sept. 20, 2007). Liability, however,

cannot be predicated on "'mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities,' and it is not sufficient even if 'the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by 'malice,' or a degree of aggravation which would entitle the plaintiff to punitive damages for another tort.'" Foley v. Polaroid Corp., 400 Mass. 82, 99 (1987). The Court, however, must bear in mind that a defendant's "extreme and outrageous conduct may be found in the totality of the circumstances, and does not have to be alleged in a single incident." Gouin, 249 F. Supp. 2d at 73.

While the standard for proving an intentional infliction of emotional distress claim is high, see Anderson v. Boston Sch. Comm., 105 F.3d 762, 766-67 (1st Cir. 1997), Currie and Shyr have alleged numerous incidents that, when taken together, support a reasonable inference that Ruske knew or should have known that his conduct would have caused them severe emotional distress. Ruske served as Currie's and Shyr's instructor. D. 1-2 ¶¶ 34, 86. Moreover, he had direct control over the grades the young women would receive in his class. Id. ¶¶ 56, 119. Despite his position of authority, Ruske engaged in unseemly conduct that he directed toward the two young women. For example, Ruske made sexually charged remarks allegedly comparing Currie's 2013 brass performance to sex, id. ¶ 54; commented on Currie's appearance and attire in lascivious manner, id. ¶¶ 42, 49, 60; solicited naked pictures of both Currie and Shyr, id. ¶¶ 67, 99; and frequently greeted Shyr in public space with kisses and hugs, and would often graze his hand across her back while giving her these hugs, all unwanted physical contact, id. ¶¶ 109-10.

Defendants argue that Currie and Shyr fail to allege "that Ruske intended to cause emotional distress to [them]." D. 6-1 at 12-13. As such, they contend that the first element of the emotional distress claim has not been met and, therefore, Counts VII and VIII must be dismissed.

Id. at 12. Massachusetts courts rely on Restatement (Second) of Torts when analyzing such claims. See Kasper v. Corley, No. SUCV201200925, 2015 WL 2062226, at *8 (Mass. Super. Ct. Apr. 2, 2015) (stating that in "[f]ollowing the Restatement (Second) of Torts, the [Supreme Judicial Court ("SJC")] recognizes liability for intentionally or recklessly caused severe emotional distress") (citing Nancy P. v. D'Amato, 401 Mass. 516, 521 (1988)). Prior to Agis v. Howard Johnson Co., 371 Mass. 140, 355 N.E.2d 315 (1976), manifestations of bodily injury were a requisite element of such a claim. In particular, the SJC has relied upon the Restatement in articulating its approach to the first element of an intentional infliction of emotional distress claim. Id. at 144-145. That comment states:

> The rule . . . applies where the actor desires to inflict severe emotional distress, and also where he knows that such distress is certain, or substantially certain, to result from his conduct. It applies also where he acts recklessly, as that term is defined in § 500, in deliberate disregard of a high degree of probability that the emotional distress will follow.

Restatement (Second) of Torts Section 46, comment i. Thus, Massachusetts courts have recognized that "[a]lthough [such a claim is] denominated an 'intentional' tort, a review of decisions in which the cause of action has survived a motion to dismiss indicates that the majority of such actions are based, not only on conduct engaged in for the purpose of causing distress, but on conduct that the actor should have known would result in distress." Quinn v. Walsh, 49 Mass. App. Ct. 696, 706 (2000).[2] Accordingly, Currie and Shyr need only allege that Ruske's actions were likely to cause Currie and Shyr to suffer severe emotional distress. They have done so.

---

[2] See, e.g., Harrison v. Loyal Protective Life Ins. Co., 379 Mass. 212, 213–214, 219–220 (1979) (holding that an intentional infliction of emotional distress claim survives a motion to dismiss where an employer, aware that his employee had cancer and was, therefore, unable to continue working for the employer, threatened to terminate the employee once he regained health if he filed for physical disability benefits); Brown v. Nutter, McClennen & Fish, 45 Mass. App. Ct. 212, 213–214, 218–219 (1998) (holding that such a claim survived a motion to dismiss where a secretary alleged she was compelled and manipulated to notarize a forged document prepared by

13

Defendants also argue that Currie and Shyr have not met the "extreme and outrageous" requirement of the second element of the intentional infliction of emotional distress claim. D. 6-1 at 12-13. Such contention here, however, does not account for the fact that "[t]he student stands in a particularly vulnerable relationship vis-à-vis the university, the administration, and the faculty. [Currie and Shyr are] away from home, subject to the authority and discipline of the institution, and under enormous pressure to succeed." Russell v. Salve Regina Coll., 649 F. Supp. 391, 402 (D.R.I. 1986).[3] Plaintiffs have alleged that Ruske repeatedly subjected them to emotional distress and that he even acknowledged the inappropriateness of his conduct on numerous occasions. D. 1 ¶¶ 105, 115, 130 (recognizing the unbecoming nature of his comments to Currie); id. ¶¶ 60, 74 (acknowledging the impropriety of his behavior toward Shyr). "[E]vidence that the defendant engaged in a pattern of conduct or repeated harassment may compound the outrageousness of incidents which, taken individually, might not be sufficiently extreme to warrant liability for infliction of emotional distress." N. Shore Pharmacy Servs., Inc. v. Breslin Assocs. Consulting LLC, 491 F. Supp. 2d 111, 132 (D. Mass. 2007) (internal quotation marks omitted).

Plaintiffs point to Chivers v. Cent. Noble Comm. Schs., 423 F. Supp. 2d 835 (N.D. Ind. 2006), a case that shares some characteristics with the facts presented here. In Chivers, the court denied summary judgment where a teacher sent sexually suggestive instant messages to his 17-year-old student. Id. at 841-42. The student had the ability to block the teacher from sending her messages, but feared he would think something was wrong if she stopped talking to him. Id. at

---

the attorney for whom she worked, on threats that he would commit suicide if she did not); Simon v. Solomon, 385 Mass. 91, 95–98 (1982) (concluding that judgment was properly entered on evidence that plaintiff suffered emotional distress as a result of the defendant landlord's failure to address repeated flooding, with water and sewage, of her basement apartment).

[3] Although the court in Russell, 649 F. Supp. at 400, dismissed the negligent infliction of emotional distress claim because of unique Rhode Island state law provisions, it did not dismiss the intentional infliction of emotional distress claim.

14

842. This was especially disconcerting to her because the teacher had control over her grades. Id. The teacher had also acknowledged in some instant messages that his behavior was "risky." Id. The district court held that a "reasonable finder of fact could conclude that [the teacher's] pursuit of [his student] was beyond the bounds of decency and went beyond a mere annoyance, triviality, or inconsiderate act that a [teenage student] should be expected to be hardened to." Id. at 858. While Defendants contend that Chivers is a case involving a more extended and invasive series of communications between a high school teacher and a teenage girl, the Court does not agree that it makes it materially distinguishable. The facts of both cases involve instructors making unwanted sexual advances on their students through text or instant messaging, despite admitting in those messages that the contact may be inappropriate. At minimum, the Chivers case lends credence that Plaintiffs have presented a viable claim for intentional infliction of emotional distress. Thus, from the factual allegations and in light of the repeated harassment alleged by Currie and Shyr, the Court concludes that the Plaintiffs have adequately pled the extreme and outrageous nature of Ruske's actions.

Defendants do not challenge the fact that Currie and Shyr suffered severe distress as a result of Ruske's actions, but even if they had, the Court finds those elements sufficiently pled. Moreover, "[b]ecause reasonable [people] could differ on these issues, [the Court] believe[s] that it is for the jury [or the Court at summary judgment] . . . to determine whether there should be liability" on this claim. Agis, 371 Mass. at 145-46 (internal citation and quotation marks omitted); see Boyle v. Wenk, 378 Mass. 592, 597-98 (1979). Accordingly, the Court denies the motion to dismiss the intentional infliction of emotional distress claims asserted in Counts VII and VIII.

### C.      Assault and Battery (Counts IX and X)

"Assault, under Massachusetts tort law, requires that the defendant 'act[ed] intending to cause a harmful or offensive contact' with plaintiff, 'or an imminent apprehension of such a contact,' and that plaintiff was 'thereby put in such imminent apprehension.'" Kennedy v. Town of Billerica, 617 F.3d 520, 538 (1st Cir. 2010) (quoting Restatement (Second) of Torts § 21(1) (1965)); Guzman v. Pring-Wilson, 81 Mass. App. Ct. 430, 434 (2012). "'An actor is subject to liability to another for battery if [a] he acts intending to cause a harmful or offensive contact with the person of the other or a third person, or an imminent apprehension of such a contact, and [b] a harmful contact with the person of the other directly or indirectly results.'" Waters v. Blackshear, 412 Mass. 589, 590-91 (1992) (quoting Restatement (Second) of Torts § 13 (1965)). In assessing whether a defendant's actions are considered to be an "offensive contact," the Court must ask whether they "would offend a reasonable person's sense of dignity." United Nat. Ins. Co. v. Penuche's, Inc., 128 F.3d 28, 32 (1st Cir. 1997); see Restatement (Second) of Torts § 18, cmt. g (1965) ("The interest which one has in the inviolability of his person and, therefore, in freedom from unpermitted contacts which, while offensive to a reasonable sense of personal dignity cause no substantial or tangible bodily harm, is an interest of dignitary rather than of material value"). "Contact offends a reasonable sense of personal dignity if it is unwarranted by the social usages at the time and place at which it is inflicted." Pettey v. Belanger ex rel. Belanger, 232 B.R. 543, 547 (D. Mass. 1999) (citing Restatement (Second) of Torts § 19, cmt. a).

Shyr alleges that shortly after Ruske solicited naked pictures from her, he began to kiss her on the cheek and hug her when he would greet her. D. 1-2 ¶¶ 108-09. Shyr further alleges that during these hugs, he would graze his hand across her lower back. Id. ¶ 110. Defendants contend that these allegations are insufficient to support a claim of assault and battery. They argue that

Shyr has "[m]erely alleg[ed] that Ruske's actions 'created a generalized fear or some other unspecified psychological harm,' [which is] insufficient to support Shyr's claim for assault and battery." D. 6-1 at 15 (quoting O'Neil v. DaimlerChrysler Corp., 538 F. Supp. 2d 304, 317 (D. Mass. 2008)). But context is everything. Far from pleading a "generalized fear" or "unspecified harm," Shyr alleges in detail Ruske's pattern of sexually harassing her through e-mail and text message. D. 1-2 ¶¶ 99-107, 111-18. She further alleges that after this sexual harassment began, he began intentionally hugging, kissing and grazing her lower back upon greeting her. Id. ¶¶ 108-09. These unwanted touches by Ruske made Shyr so uncomfortable that she began hiding "behind doors and walls at BU whenever she saw him approach." Id. ¶ 125. The allegation of sexual harassment—both verbal and physical—of a student by her professor is certainly sufficient to offend a reasonable person's sense of personal dignity. See Strong v. Wisconsin, 544 F. Supp. 2d 748, 763 (W.D. Wis. 2008) (noting that "the standard for what qualifies as 'offensive' is a low one" and agreeing with another court that "[t]he uninvited kiss, no matter how cold and chaste, upon the nonconsenting . . . is an assault and battery") (internal quotation and citation omitted); see also Westcott v. City of Omaha, 901 F.2d 1486, 1489 (8th Cir. 1990) (explaining that a "defendant may be liable [for battery] when intending only a joke, or even a compliment, as where an unappreciated kiss is bestowed without consent, or a misguided effort is made to render assistance"); Mortenson v. City of Oldsmar, 54 F. Supp. 2d 1118, 1121-22 (M.D. Fla. 1999) (denying Defendant's motion for summary judgment because a city councilman's hug and kiss of a city clerk at an official function could be "offensive" and uninvited). While Defendants correctly cite the proposition that "[w]ords do not make the actor liable for assault unless together with other acts or circumstances they put the other in reasonable apprehension of an imminent harmful or offensive contact with his person," O'Neil, 538 F. Supp. 2d at 317 (internal quotation and citation

omitted), Shyr has met her burden of pleading the "other acts or circumstances" that put her in reasonable apprehension of offensive contact with Ruske. Shyr has presented sufficient facts that, if accepted as true, support plausible claims of assault and battery and, accordingly, the Court will DENY Defendants' motion to dismiss Counts IX and X.

**VI.    Conclusion**

For the foregoing reasons, the Court DENIES Defendants' motion to dismiss, D. 6.

**So Ordered.**

/s/ Denise J. Casper
United States District Judge